# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JILL M. DEMACIO,                    )
                                    )
             Plaintiff,             )
                                    )
        v.                          )          02:  12-cv-1313
                                    )
COMMISSIONER OF                     )
SOCIAL SECURITY,                    )
                                    )
             Defendant.             )

## MEMORANDUM OPINION AND ORDER OF COURT

March 27, 2014

## I.    INTRODUCTION

Jill M. Demacio ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f ("Act").  This matter comes before the Court on cross motions for summary judgment.  (ECF Nos. 10, 14).  The record has been developed at the administrative level.  For the following reasons, Plaintiff's Motion for Summary Judgment will be GRANTED in part and DENIED in part.

## II.   PROCEDURAL HISTORY

Plaintiff filed for DIB and SSI with the Social Security Administration on August 5,

2009, claiming a disability onset of August 4, 2008.  (R. at 123 – 34, 152 – 56).[1]  She claimed that her inability to work was a result of functional limitation stemming from dizziness, panic attacks, fear, lack of bladder control, and issues with digestion.  (R. at 158).  Plaintiff was initially denied benefits on January 5, 2010. (R. at 89 – 98).  A hearing was scheduled for March 1, 2011, and Plaintiff appeared to testify represented by counsel.  (R. at 38 – 62).  A vocational expert ("VE") also testified.  (R. at 38 – 62).  The Administrative Law Judge ("ALJ") issued his decision denying benefits to Plaintiff on May 27, 2011.  (R. at 10 – 34).  Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on July 26, 2012, making the decision of the ALJ the final decision of the Commissioner.  (R. at 1 – 5).

Plaintiff filed her Complaint in this Court on September 14, 2012.  (ECF No. 3). Defendant filed an Answer on December 11, 2012.  (ECF No. 4).  Cross motions for summary judgment followed.  The matter has been fully briefed and is ripe for disposition.

## III. STATEMENT OF THE CASE

### A. General Background

Plaintiff was born on December 3, 1983, was 25 years old at the time of her application for benefits, and 27 years old at the time of the ALJ's decision.  (R. at 42).  She resided in the home of her mother with a boyfriend, but at the time of application for benefits resided with her now-former spouse.  (R. at 42, 170).  Plaintiff graduated from high school, but was allegedly enrolled in special education classes with the exception of mathematics.  (R. at 166).  She was unable to complete attempted post-secondary education.  (R. at 166).  Plaintiff had a sporadic history of part-time work.  (R. at 159).  She indicated that she was not engaged with any type of vocational rehabilitation or other support services at the time of application for benefits.  (R. at

---

[1]     Citations to ECF Nos. 7 – 7-16, the Record, *hereinafter*, "R. at __."

167).  She subsisted on cash assistance, and received medical benefits from the state.  (R. at 43, 157).

In a self-report of daily activities completed at the time of her application for benefits, Plaintiff indicated that a typical day included feeding, walking, and playing with her pets; playing cards; watching television; talking on the telephone; using the computer; showering; and completing household chores such as laundry and cleaning.  (R. at 170 – 72, 174).  Plaintiff also stated that she would "sometimes" experience panic attacks and crying spells during the day.  (R. at 170).  She complained of difficulty sleeping.  (R. at 171).  She did not have physical difficulty with self-care, but hated shaving, forgot to shower, and did not like to undress due to issues with her self-image.  (R. at 171).  Plaintiff did not prepare her own meals because she "did not like cooking anymore."  (R. at 172).  While she left the house several times per week, she preferred not to do so alone due to fear of strange men, dogs, and the dark.  (R. at 173).  Plaintiff went grocery shopping once per month and to church once per week, but could not drive herself due to a history of blackouts.  (R. at 173 – 74).

Plaintiff was capable of paying bills, handling a checking/savings account, and counting change.  (R. at 173).  She could walk for five minutes before needing ten minutes to rest.  (R. at 175).  Her attention span was only two minutes, she did not finish what she started, and she did not follow written or spoken instructions well.  (R. at 175).  Plaintiff did not like big crowds or new people, but got along well with authority figures and had never lost a job due to difficulties with others.  (R. at 175 – 76).  Plaintiff claimed that she did not handle stress or changes in routine well.  (R. at 176).

## B.  Educational Records

Plaintiff attended Langley High School in Pittsburgh, Pennsylvania, from 1998 until

2002, when she graduated.  (R. at 183).  Plaintiff's cumulative grade point average was 2.327, and her class rank was 86 of 112.  (R. at 183).  The record here, however, contained no more than a single-page academic transcript.  (R. at 183).  There is no indication that she was enrolled in special education courses or programs, or that she received additional assistance or instruction during her time in school.  (R. at 183).  There is no indication that an individualized educational program was in place.  (R. at 183).

### C.  Treatment History

Plaintiff received treatment from a primary care physician at Ambridge Area Healthcare beginning in January 2008.  (R. at 211 – 21).  At her initial visit, Plaintiff was noted to complain of poor sleep and migraine headaches.  (R. at 221).  Her orientation, memory, mood, and affect were indicated to be normal.  (R. at 221).  At a follow-up visit in March 2008, however, Plaintiff also complained of depression, bipolar disorder, constipation, dizziness, knee problems, swollen hands, back pain, car sickness, sweating, and urinary incontinence when sneezing or laughing.  (R. at 220).  An MRI and EEG were ordered for the dizziness, and Celexa was prescribed for depression.  (R. at 219).  Trazadone was prescribed for sleep.  (R. at 219).  Plaintiff's orientation, memory, mood, and affect were still indicated as normal.  (R. at 219).  In September 2008, Plaintiff complained of continuing dizziness and poor sleep.  (R. at 215).  She had also just been married, and complained of increased anxiety and panic attacks.  (R. at 215).  Plaintiff's prescriptions were adjusted, and her mood and affect were observed to be blunted.  (R. at 215).  She was advised to undergo an MRI for her dizziness, as she had not yet done so.  (R. at 215).  Plaintiff's complaints to her primary care physician remained generally the same through November 2008.  (R. at 211 – 14).

Beginning in August 2008, Plaintiff began counseling at the Staunton Clinic in

Sewickley, Pennsylvania. (R. at 241 – 46). Plaintiff reported living with her husband, who received SSI for mental retardation. (R. at 241). She had no other income. (R. at 241). Plaintiff described being raped and beaten at age fifteen by an ex-boyfriend, having a verbally abusive father, having flashbacks of past trauma, having panic attacks, hitting her husband, and passing out and blacking out almost daily. (R. at 241, 246). Plaintiff's sleep was poor, as was her concentration. (R. at 241). She endorsed experiencing anhedonia, hopelessness, excessive worry, irritability, and poor self-esteem. (R. at 241, 246). Plaintiff denied any physical pain or treatment for such. (R. at 245).

Plaintiff was observed by her counselor to be well-groomed and cooperative, with normal motor activity and behavior, normal speech, alertness, good eye contact, appropriate affect, logical thought, normal thought content, and intact memory. (R. at 242). Yet her judgment and insight were indicated to be poor, her intelligence was below average, and her mood was sad, anxious, and fearful. (R. at 242). She was recommended for individual therapy and a psychiatric evaluation. (R. at 243). Initial diagnoses included post-traumatic stress disorder ("PTSD"), major depressive disorder, and possible anxiety disorder, panic disorder, and mental retardation. (R. at 245). She was assigned a global assessment of functioning score ("GAF") of 52.[2] (R. at 245).

On September 8, 2008, Plaintiff underwent an MRI of the brain, the results of which were relatively unremarkable with the exception of an abnormal signal indicating a possible focus of

---

[2]    The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *Id.*

demyelination. (R. at 202). Follow-up for clinical study was recommended. (R. at 202).

On September 10, 2008, Plaintiff was again seen for individual therapy at the Staunton Clinic. (R. at 247). She complained of traumatic flashbacks. (R. at 247). Her therapist noted her affect, mood, physical appearance, speech, thought organization, orientation, impulse control, insight, and judgment to be unremarkable. (R. at 247). A GAF score of 52 was assigned, and Plaintiff was noted to "brighten at times." (R. at 247). Ongoing therapy sessions in September, October, November, and December 2008 included similar objective observations by treating specialists and similar complaints by Plaintiff, albeit with noted general improvement in symptoms and GAF scores. (R. at 237 – 40, 248 – 49, 364). By December, Plaintiff reported that she was "doing great!" (R. at 364). She had no panic, no flashbacks, and no issues being around others. (R. at 364).

On September 15, 2008, Plaintiff was evaluated by a psychiatrist at the Staunton Clinic for medication management. (R. at 231 – 36). Plaintiff had a history of taking Celexa and Trazadone for mental health treatment. (R. at 231). Plaintiff was observed to be well-groomed and cooperative, with normal motor activity and behavior, normal speech, alertness, good eye contact, logical and organized thought, normal perception, normal impulse control, intact memory, fair insight, fair judgment, and average intelligence. (R. at 232). However, while her affective expression was appropriate and full, it was also anxious, and Plaintiff's mood was sad, anxious, and fearful. (R. at 232). She experienced paranoid ideation. (R. at 232). The psychiatrist diagnosed mood disorder, PTSD, and possible anxiety disorder. (R. at 235). Plaintiff was assigned a GAF score of 51. (R. at 235).

In October 2008, Plaintiff was examined by James Pilla, D.O., for complaints of episodic nausea and vomiting over the prior one-and-one-half months. (R. at 205 – 06). It was primarily

experienced after meals and taking medications, and included heartburn and acid regurgitation. (R. at 205 – 06). Plaintiff claimed to have lost 11 pounds in the intervening period but denied any lower gastrointestinal issues except for occasional constipation. (R. at 205 – 06). Plaintiff did not complain of pain, weakness, headache, or significant mental disturbance, and was observed to be alert, oriented, and in no acute distress. (R. at 205 – 06). Imaging of the abdomen and blood test results were negative for abnormalities. (R. at 205 – 06). An esophageal biopsy was also negative. (R. at 205 – 06). Dr. Pilla prescribed Prevacid for suspected gastroesophageal reflux disease ("GERD"). A solid phase gastric emptying study was recommended, (R. at 205 – 06), the results of which were ultimately consistent with a diagnosis of gastroparesis. (R. at 324).

At a medication check with her psychiatrist at the Staunton Clinic on October 13, 2008, Plaintiff reported "doing much better," being less emotional, and having less panic. (R. at 228). She was observed to be well-groomed and in a "better mood." (R. at 228). She was prescribed Abilify, Celexa, and Seroquel. (R. at 229).

On November 4, 2008 Plaintiff was evaluated by a neurologist at Allegheny Neurological Associates in Pittsburgh, Pennsylvania. (R. at 224 – 25). She complained of dizziness, blackouts, and staring spells. (R. at 224). Plaintiff claimed that she had experienced dizziness for nine years. (R. at 224). Sometimes she passed out and would fall, particularly when it was hot. (R. at 224). The neurologist recorded a history of attention deficit hyperactivity disorder, migraines, and insomnia. (R. at 224). Plaintiff was observed to have normal orientation, memory, attention, concentration, language, and fund of knowledge. (R. at 225). She had normal motor movement, normal muscle tone, and no muscle atrophy. (R. at 225). Coordination, sensation, and gait were all normal. (R. at 225). The neurologist considered the

results of Plaintiff's brain MRI to be unremarkable. (R. at 225). Seizures and syncope were suspected. (R. at 225). An EEG was recommended, as was a work-up for syncope. (R. at 225).

At a medication check with her psychiatrist at the Staunton Clinic on November 10, 2008, Plaintiff indicated that she was "doing pretty well" and that she "feels better" overall, despite also feeling sedated on her dosage of Seroquel. (R. at 230). The psychiatrist observed Plaintiff to be well-groomed, in a "better mood," and exhibiting a "brighter affect." (R. at 230). Her Seroquel dosage was reduced. (R. at 229).

At a visit to her primary care physician at Ambridge Area Healthcare on January 7, 2009, Plaintiff exhibited a good mood. (R. at 399). She had normal orientation, memory, mood, and affect. (R. at 399). Plaintiff's migraines had a "good response" to a low dose of prescription medication. (R. at 399).

On January 16, 2009, counseling records from the Staunton Clinic indicated that Plaintiff had unremarkable affect, mood, physical appearance, speech, thought organization, orientation, impulse control, insight, and judgment. (R. at 367). Plaintiff reported having a seasonal job at Toys 'R Us, and "did well with it." (R. at 367). She was "feeling positive," and was considering becoming pregnant. (R. at 367). Plaintiff was assigned a GAF score of 56. (R. at 367). Objective findings by Plaintiff's therapist were generally consistent with the above through April 15, 2009, as were Plaintiff's subjective complaints, with general indications of improvement, although issues between Plaintiff and her husband were noted. (R. at 361 – 63).

Plaintiff's psychiatrist at Staunton Clinic made similar findings during the same period of time, (R. at 357 – 60), indicating in February 2009, for example, that Plaintiff was "doing good on present . . . meds." (R. at 358). Plaintiff exhibited longer periods of stability and euthymic mood. (R. at 358). She learned how to better cope with her underlying problems. (R. at 358).

On January 19, 2009, psychologist Edward Currie, Ph.D. completed a Psychological Evaluation of Plaintiff that was less positive regarding her condition.  (R. at 342 – 48).  Plaintiff was driven to the evaluation by her husband, was appropriately dressed, and cooperative.  (R. at 342).  However, Plaintiff asked Dr. Currie that the door to the evaluation room be left slightly open.  (R. at 342).  Plaintiff reported to Dr. Currie that she cried easily, was afraid to be around people, and began experiencing dizziness, blackouts, depression, and anxiety following sexual abuse by an ex-boyfriend at fifteen years of age.  (R. at 342).  Plaintiff maintained regular contact with her family, particularly her maternal grandmother.  (R. at 343).  Prior to her marriage, Plaintiff spent a great deal of time with three friends.  (R. at 343).  She attended church weekly, enjoyed playing video games, and enjoyed watching television.  (R. at 343).  Plaintiff was noted to have graduated high school, but no mention was made of a need for special educational assistance or curriculum.  (R. at 343).  Plaintiff dropped out of a Veterinary Assistant program at the Western School for Health & Business at her father's urging, to do housework.  (R. at 343).  Thereafter, Plaintiff held numerous part-time jobs through December 2008, but never stayed due to an alleged fear of people.  (R. at 344).

Upon examination, Dr. Currie observed Plaintiff to be alert and oriented.  (R. at 344).  Plaintiff's mood was depressed and her affect was reactive and appropriately variable, and consistent with thought content.  (R. at 344).  Her speech was within normal limits, her thought processes were goal-oriented, her thought content was relevant, her fund of knowledge was average, immediate memory[3] tasks were performed correctly, recent memory functions and recent past memory functions were fair, remote memory was low-average, judgment was average, and impulse control was average.  (R. at 344 – 45).  Plaintiff's eye contact was poor, her thought productivity was poor, abstract thinking was poor, concentration and attention were

---

[3]        Equivocally, Dr. Currie also found that "her memory functions were poor."  (R. at 345).

poor[4], and Plaintiff had difficulty with mathematics. (R. at 344 – 45).

Plaintiff was diagnosed with recurrent major depressive disorder, anxiety disorder, and borderline intellectual functioning. (R. at 345). Dr. Currie assigned a GAF score of 51, and recorded Plaintiff's prognosis as "fair." (R. at 345). Dr. Currie believed that Plaintiff was capable of managing her own benefits. (R. at 345). In terms of activities of daily living such as housework, shopping, and personal care, Plaintiff was found capable of engaging in said activities on a sustained basis. (R. at 345). Social involvement was limited, however, and concentration, persistence, and pace were in the low-average range. (R. at 345). In a functional evaluation following his examination findings, Dr. Currie specifically noted that Plaintiff would have marked limitations in understanding, remembering, and carrying out detailed instructions, making judgments on simple work-related decisions, and responding appropriately to work pressures in a usual setting. (R. at 346 – 47). As support, Dr. Currie noted that Plaintiff had limited problem solving abilities and unusual behavior. (R. at 346 – 47).

Plaintiff was examined by neurologists Phillip Justice, D.O. and Kevin M. Kelly, M.D. on April 19, 2009 for complaints of blackouts. (R. at 352 – 54). Plaintiff claimed that dizziness often accompanied the blackouts and could be triggered by different activities. (R. at 352). Plaintiff also complained of "staring spells." (R. at 352). It was noted that an EEG in January 2009 was normal. (R. at 352). Yet, Plaintiff asserted that she experienced dizziness and blackouts up to three times per week. (R. at 352). Plaintiff denied anxiety, depression, nightmares, tiredness, and poor concentration. (R. at 353). Upon examination, the doctors observed appropriate orientation, memory, attention, concentration, language, and fund of knowledge. (R. at 353). Plaintiff had full strength, normal muscle tone, normal movement,

---

[4]        Dr. Currie also reports, somewhat inconsistently, that "[c]oncentration persistence and pace are in the low average range." (R. at 345).

intact sensation, and normal gait.  (R. at 353).  Another EEG was ordered.  (R. at 354).

On July 21, 2009, Plaintiff returned to Dr. Pilla regarding follow-up on her complaints of nausea and vomiting, and on her diagnosis of gastroparesis.  (R. at 369 – 70).  Plaintiff continued to take prescription medication for gastroparesis and GERD, and reported that her symptoms had improved and that she had gained weight.  (R. at 369).  Dr. Pilla opined that she was "doing quite well" overall.  (R. at 369).

On October 7, 2009, state agency evaluator Nghia Van Tran, M.D. completed a Physical Residual Functional Capacity Assessment ("RFC") of Plaintiff.  (R. at 436 – 42).  Following a review of the medical record, Dr. Van Tran concluded that the evidence supported finding impairment in the way of dizziness, gastroparesis, and chronic knee pain.  (R. at 436).  As a result of these impairments, Plaintiff would be limited to occasionally lifting and carrying fifty pounds, frequently lifting and carrying twenty-five pounds, standing and walking approximately six hours of an eight hour work day, and sitting approximately six hours.  (R. at 437).  Plaintiff was not otherwise considered to be functionally limited.  (R. at 437 – 40).  Dr. Van Tran cited to medical records which demonstrated improvement in physical symptoms with treatment, and relatively normal diagnostic testing and imaging results.  (R. at 441 – 42).

On October 9, 2009, Plaintiff was evaluated by neurologist Anto Bagic, M.D. relative to complaints of ongoing dizziness, blackouts, and passing out.  (R. at 541 – 44).  She reported episodes occurring every few days.  (R. at 541).  Plaintiff claimed to have headaches every four days, if not medicated, and every two weeks, if medicated.  (R. at 542).  Dr. Bagic noted that Plaintiff did not provide details of symptoms associated with migraines when describing the headaches.  (R. at 542).  An EEG in 2010 was noted to be normal, as was an MRI of the brain in 2008.  (R. at 542).  Some of Plaintiff's complaints were noted to be inconsistent.  (R. at 541 –

43).

Dr. Bagic observed Plaintiff to be pleasant and comfortable. (R. at 543). Plaintiff was alert and oriented, was coherent, conversant, and appropriate, and had no problems writing a sentence, reading, or following commands. (R. at 543). Motor, sensory, and coordination exams were normal. (R. at 543). Dr. Bagic ultimately concluded that seizures were unlikely. (R. at 543 – 44). Another MRI and an epilepsy monitoring unit were recommended. (R. at 544). Plaintiff was to follow-up in three months. (R. at 544).

On November 16, 2009, T. David Newman, Ph.D. completed a Clinical Psychological Disability Evaluation and Intellectual Evaluation of Plaintiff on behalf of the Bureau of Disability Determination. (R. at 443 – 47). Plaintiff was accompanied by her husband and mother, and arrived forty five minutes late. (R. at 443). She was casually attired and cooperative. (R. at 443). Plaintiff informed Dr. Newman that she did not believe that she could work as a result of "memory loss, dizziness, blacking out, passing out, [and] depression." (R. at 443). Dr. Newman noted that for the previous eighteen months, Plaintiff had been seeking treatment for her psychological issues at Staunton Clinic. (R. at 443). Plaintiff described experiencing sexual abuse at the hands of an ex-boyfriend and having a dysfunctional relationship with her father. (R. at 443). She stated that her mood was "horrible," and that she cried "all the time." (R. at 444). Plaintiff stated that she graduated high school, and vaguely indicated requiring learning support classes and special education. (R. at 443). Plaintiff reported a sporadic work history. (R. at 443). Plaintiff also stated that she could not do anything on her own, because "her neurologist said that this was risky." (R. at 444). Plaintiff enjoyed using the computer, watching television, and playing with her pets. (R. at 444).

Upon examination, Dr. Newman observed Plaintiff to practice adequate hygiene and

grooming, to make good eye contact, to be "not at all anxious," and to be alert and responsive. (R. at 444). It was not difficult to establish a rapport, Plaintiff's speech was relevant, rational, and coherent, and a mild lisp did not impede effective communication. (R. at 444). Plaintiff's mood was euthymic, she exhibited a good range of affective expression, and she was appropriate. (R. at 444). Plaintiff's abstract thinking was intact, and she had no difficulties with similarities and differences, or simple sayings. (R. at 444). Concept formation was also intact. (R. at 444). Her general fund of information was "somewhat limited," but her ability to complete simple mathematics was intact, as was her ability to maintain attention "throughout the lengthy intelligence and achievement testing." (R. at 444). Despite Plaintiff's complaints to the contrary, Dr. Newman found her memory to be fairly intact. (R. at 444 – 45). Plaintiff had no issues with impulse control, had sufficient social judgment and judgment for avoiding sources of jeopardy, and her insight was good. (R. at 445).

Administration of testing for the Wechsler Adult Intelligence Scale IV yielded a "verbal comprehension score of 68 (mentally retarded), a perceptual reasoning score of 69 (mentally retarded), a working memory score of 77 (borderline), and a processing speed score of 89 (low average)." (R. at 445). Plaintiff's full scale IQ was 70, representing intellectual functioning in the "poor line range." (R. at 445). Tests results were considered to be valid. (R. at 445). Dr. Newman opined that these scores were most indicative of a "learning disorder as opposed to a global level of intellectual functioning given areas of specific strength and weakness." (R. at 446).

Dr. Newman concluded his assessment by stating that Plaintiff had the ability to understand and retain instructions for simple, repetitive tasks, and maintain concentration and pace for the same purpose. (R. at 446). Given her sociability and cordial attitude, she would not

have a significant problem interacting with others. (R. at 446). There was no evidence of depression, no indication of panic, and no apparent fear of darkness. (R. at 446). With respect to Plaintiff's "mood disorder and anxiety, either her medications are highly effective (she says they are not) or the conditions are not present at least to a significant degree." (R. at 446). Plaintiff was diagnosed with a learning disorder. (R. at 446). She was believed capable of managing her own benefits. (R. at 446). She was expected to have no more than moderate limitation in any functional area. (R. at 446 – 47).

On December 4, 2009, state agency evaluator Michelle R. Santilli, Psy.D. completed a Mental RFC of Plaintiff. (R. at 448 – 50). Following a review of the medical record, Dr. Santilli determined that the evidence supported finding impairment in the way of affective disorders, mental retardation, and anxiety-related disorders. (R. at 448). As a result of said impairments, Plaintiff was expected to experience marked limitation with respect to understanding, remembering, and carrying out detailed instructions. (R. at 448 – 49). Plaintiff would suffer moderate limitation in all other areas. (R. at 448 – 49). Dr. Santilli opined that Plaintiff was more limited than indicated by Dr. Newman, but that she was capable of simple, routine, repetitive work in a stable environment, she could understand, retain, and follow simple instructions, she could make simple decisions, and she could sustain a routine without special supervision. (R. at 450).

On May 14, 2010, Plaintiff was evaluated by neurologist Thomas M. Dugan, Jr., M.D. for complaints of lightheadedness and dizziness at least every other day. (R. at 539 – 40). It was worst when she exerted herself, and she reported passing out on occasion. (R. at 539). Dr. Dugan observed Plaintiff to be alert and to have adequate language function. (R. at 539). He did not believe Plaintiff's complaints to be suggestive of neurologic events. (R. at 540). Further,

there was no evidence that Plaintiff's complaints were related to seizure activity. (R. at 540). He recommended continued psychiatric care. (R. at 540).

The record shows that Plaintiff continued to treat at the Staunton Clinic for individual therapy and medication management through October 2010. (R. at 491 – 507). She made progress in therapy, received GAF scores in the mid 50's, and was regularly noted to have unremarkable affect, mood, appearance, speech, thought organization, orientation, impulse control, insight, and judgment. (R. at 491 – 507). In spite of some gaps in treatment, by the time of her last treatment session, Plaintiff was noted by her psychiatrist to have normal psychomotor activity, normal rate of speech, normal volume of speech, euthymic mood, normal range of affect, no suicidal ideation, normal impulse control, no delusions or hallucinations, full orientation, and good insight. (R. at 491 – 507).

Plaintiff switched to Chartiers Mental Health/Mental Rehabilitation Center, Inc. of Bridgeville, Pennsylvania on October 13, 2010. (R. at 508). She was discharged from care on February 10, 2011 after attending only two of eight scheduled counseling sessions. (R. at 508). Her intake GAF score was 60, and her GAF score at termination was 55. (R. at 508). Plaintiff's final diagnoses were bipolar disorder and generalized anxiety disorder. (R. at 508). Plaintiff saw improvement with treatment, and her moods stabilized with medication. (R. at 508).

### D. Administrative Hearing

At her hearing, Plaintiff testified that she was recently divorced and now lived in her mother's home with her boyfriend. (R. at 42). Plaintiff explained that she had graduated from high school, but required special educational assistance to do so for every class except Mathematics. (R. at 43 – 44). She allegedly twice attempted to obtain training to become a nurse's aide, but dropped out of the program due to difficulty comprehending and remembering

course material.  (R. at 44).  She also cited a lack of support from her former husband, as well as her father – who wanted Plaintiff to remain at home to care for her brother.  (R. at 44).  Plaintiff stated that she had not worked for approximately two years – her last position being that of a waitress.  (R. at 44).  She quit that position due to blackouts while on the job.  (R. at 45).  Plaintiff went on the describe losing other jobs as a result of poor attendance attributable to frequent dizziness, anxiety attacks, and nausea.  (R. at 45).  She did not believe that she could handle a full-time position any longer due to her combined physical and mental ailments.  (R. at 45).

Plaintiff complained of severe anxiety attacks that caused her to pass out, and significant gastrointestinal issues that caused frequent sickness and vomiting.  (R. at 46).  Current prescribed medications did not provide complete relief from these issues.  (R. at 46).  Plaintiff still experienced dizziness as often as four times per week for up to an hour at a time.  (R. at 46, 48).  The dizziness required Plaintiff to sit down.  (R. at 48).  Plaintiff relayed that neurologists felt that this was mostly related to anxiety.  (R. at 48).  She did not personally believe these diagnoses to be correct.  (R. at 49).

Plaintiff also alleged having an overactive bladder and occasional accidents.  (R. at 47).  She could not afford protective garments.  (R. at 48).  Plaintiff claimed that she had anxiety attacks approximately twice per week, and believed that these were unrelated to her dizziness.  (R. at 49).  She stated that since her divorce, her anxiety had improved.  (R. at 49).  Plaintiff could not explain the cause of her anxiety attacks.  (R. at 50).  Plaintiff also reported experiencing migraine headaches up to twice per week for one or two hours, and had to lay down, take over-the-counter pain medication, turn off the lights, and wear an ice pack for relief.  (R. at 53 – 54).  Prescription medication helped to control Plaintiff's migraines.  (R. at 56).

Plaintiff's counsel briefly noted that she was enrolled in special education while in school. (R. at 56).

Plaintiff testified that she regularly showered, watched television, exercised for forty five minutes, washed dishes and laundry, and used the microwave to make simple meals. (R. at 50 – 51). She feared going out alone, cooking with the stove or oven, and being in public places. (R. at 51). Plaintiff seldom went to restaurants and did not visit friends. (R. at 51 – 52). For fun, she watched television, played games, used the computer, used Facebook on the internet, and rode her bike with her boyfriend. (R. at 52 – 53).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical person of Plaintiff's age, educational background, and work experience would be capable of engaging in full-time work existing in significant numbers in the national economy if limited to lifting no more than twenty pounds occasionally and ten pounds frequently, standing and walking no more than six hours of and eight hour work day, and sitting no more than six hours. (R. at 58 – 59). Additionally, he or she would need to avoid concentrated exposure to heat and all exposure to hazards such as heights and moving machinery, and would be relegated to simple, routine, repetitive tasks, and low stress work defined as occasional simple decision-making and occasional changes in work setting. (R. at 59). Interaction with co-workers and supervisors could only be occasional, and there could be no interaction with the general public. (R. at 59).

The vocational expert responded that such a person would be capable of sustaining full-time employment in "bench assembly," with 737,000 light positions available in the national economy, in "hand packers" occupations, with 200,000 positions available, and in "hand working" occupations, with 115,000 positions available. (R. at 59). The ALJ followed by

inquiring whether the hypothetical person could maintain these jobs if he or she would be off-task twenty percent of any given work day, or would miss at least two days of work, per month. (R. at 60). The vocational expert replied that no jobs would be available to such a person. (R. at 60).

## IV.    STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs

available in the national economy.  *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues.  42 U.S.C. §§ 405(g)[5], 1383(c)(3)[6]; *Sweeney v. Comm'r of Soc. Sec.*, 847 F. Supp. 2d 797, 800 (W.D. Pa. 2012) (citing *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999)).  Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole.  *See* 5 U.S.C. §706.  The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact.  *Gaddis v. Comm'r of Soc. Sec.*, 417 F. App'x 106, 107 n. 3 (3d Cir. 2011) (citing *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002)).

Substantial evidence is defined as "'more than a mere scintilla'; it means 'such relevant evidence as a reasonable mind might accept as adequate'" to support a conclusion.  *Hagans v. Comm'r of Soc. Sec.*, 694 F. 3d 287, 292 (3d Cir. 2012) (quoting *Plummer v. Apfel*, 186 F. 3d 422, 427 (3d Cir. 1999)).  If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive.  *Id.* (citing *Fargnoli v. Massanari*, 247 F. 3d 34, 38 (3d Cir. 2001)); 42 U.S.C. § 405(g).  When considering a case, a district court cannot conduct a *de novo*

---

[5]      Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[6]      Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Gamret v. Colvin*, 2014 WL 109089 at *1 (W.D. Pa. Jan. 10, 2014) (citing *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947)). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, even where this court acting *de novo* might have reached a different conclusion, "so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Albert Einstein Med. Cntr. v. Sebelius*, 566 F. 3d 368, 373 (3d Cir. 2009) (quoting *Monsour Med. Cntr. v. Heckler*, 806 F. 2d 1185, 1191 (3d. Cir. 1986)).

## V.    DISCUSSION

In his decision, the ALJ concluded that Plaintiff suffered from the following severe medically determinable impairments: bilateral knee chondromalacia, gastroparesis, GERD, migraine headaches, obesity, learning disorder, bipolar disorder, major depressive disorder, borderline intellectual functioning, and generalized anxiety disorder. (R. at 15). As a result of those impairments, the ALJ concluded that Plaintiff would be limited to light work, except that she

> must avoid concentrated exposure to extreme heat. She must avoid all exposure to hazards such as heights and moving machinery. She is able to perform simple, routine, repetitive tasks. She requires low stress work defined as occasional simple, decision making and occasional changes in the work setting. She can have occasional interaction with coworkers and supervisors and no interaction with the public.

(R. at 19). Nevertheless, based upon the testimony of the vocational expert, the ALJ found that Plaintiff would be capable of engaging in substantial gainful activity in a variety of jobs existing

in significant numbers in the national economy. (R. at 28 – 29). Plaintiff was not, therefore, awarded benefits. (R. at 30).

Plaintiff now objects to this decision by the ALJ, arguing that the ALJ erred in failing to find Plaintiff disabled at Step 3 in accordance with 20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 12.05(C) ("Mental Retardation"), in failing to accommodate all of Plaintiff's credibly established limitations attributable to diminished intellectual functioning in his RFC and hypothetical to the vocational expert, and in failing to accommodate all of Plaintiff's credibly established limitations attributable to migraine headaches in his RFC and hypothetical question to the vocational expert. (ECF No. 11 at 5 – 16). Defendant counters that the ALJ's decision was properly supported by substantial evidence, and should be affirmed. (ECF No. 15 at 14 – 20). The Court agrees with Plaintiff, but limitedly in part.

**A. Mental Retardation**

As to Plaintiff's first argument regarding the ALJ's determination at Step 3, the criteria under 12.05(C) are, in pertinent part, as follows:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> . . .
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R., Pt. 404, Subpt. P, App'x 1. The United States Court of Appeals for the Third Circuit has held that in order to "meet the requirements of § 12.05C a claimant must i) have a valid verbal, performance or full scale IQ of 60 through 70, ii) have a physical or other mental

impairment imposing additional and significant work-related limitations of function, and iii) show that the mental retardation was initially manifested during the developmental period (before age 22)." *Markle v. Barnhart*, 324 F. 3d 182, 187 (3d Cir. 2003). In his decision, the ALJ did not dispute that Plaintiff met the first and second prongs of the above test, but concluded that this was not sufficient because Plaintiff did not adduce evidence of "deficits in adaptive functioning." (R. at 19). As a result, the ALJ declined to award benefits at Step 3. (R. at 19).

Plaintiff asserts that the ALJ's finding was erroneous because finding "deficits in adaptive functioning" is not a fourth prong in the established *Markle* test, Listing 12.05(C) does not adequately define what is meant by "deficits in adaptive functioning," and Plaintiff nonetheless demonstrated the existence of ongoing functional deficits. (ECF No. 11 at 5 – 13). As to Plaintiff's first point, the Court finds that it is now well settled in this Circuit that the third prong of the *Markle* test requires a claimant to show "'deficits in adaptive functioning' with an onset prior to the age of 22" in addition to an IQ score with one of the required ranges of severity. *Gist v. Barnhart*, 67 F. App'x 78, 81 (3d Cir. 2003). *See also Landsdowne v. Astrue*, No. 11-487, 2012 WL 4069363, at *4 n.4 (W.D. Pa. Sept. 17, 2012) ("Although not specifically mentioning the need to establish 'deficits in adaptive functioning,' *Markle* did expressly hold that a claimant must show 'mental retardation' manifested before age 22, and Listing 12.05 explicitly states that 'mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning.' Accordingly . . . *Markle* is wholly consistent with the subsequent decisions in *Gist* . . . as well as with the clear and unequivocal pronouncement made in the explanatory notes to the mental disorder listings in 12.00A."). Mental retardation may be inferred based upon a longitudinal history of functioning, and for that reason evidence of deficits in adaptive functioning may be important when the record lacks

evidence of a specific diagnosis. *Markle*, 324 F. 3d at 189.

Plaintiff's second and third contentions are more persuasive, however. Plaintiff correctly points out that the regulations do not "provide any standards or guidelines by which to assess and measure the existence or severity of a claimant's alleged deficits." *Thomas v. Colvin*, No. 13-267, 2014 WL 584048, at *9 (W.D. Pa. Feb. 14, 2014). In the commentary material issued along with 2002 rules revising the listing of impairments, the Social Security Administration ("SSA") explained that the phrase was purposefully left open-ended. *See Technical Revisions to Medical Criteria for Determination of Disability*, 67 FR 20018-01 (Apr. 24, 2002). As the SSA recognized, each of the four leading professional mental health organizations defines "intellectual disability" in a slightly different way. *Id.* "While all the definitions require significant deficits in intellectual functioning, as evidenced by IQ scores of approximately 70 or below, age of onset and the method of measuring the required deficits in adaptive functioning differ among the organizations." *Id.* In revising Listing 12.05, the SSA declined to endorse "the methodology of one professional organization over another" and instead continued to "allow[] the use of any of the measurement methods recognized and endorsed by the professional organizations."[7] *Id.*

---

[7] According to the DSM-IV, promulgated by the American Psychiatric Association ("APA"), an individual displays "deficits in adaptive functioning" if she has "significant limitations in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety." *Diagnostic and Statistical Manual of Mental Disorders, Text Revision* (DSM–IV–TR) 41 (4th ed. 2000). The American Association of Mental Retardation ("AAMR") (now the American Association on Intellectual and Developmental Disabilities ("AAIDD")), utilizes the following standard: an individual qualifies as intellectually disabled if she has significant limitations in intellectual functioning and adaptive behavior as expressed in conceptual (*i.e.*, receptive and expressive language, reading and writing, money concepts, and self-direction); social (*i.e.*, interpersonal, responsibility, self-esteem, gullibility, naiveté, follows rules, obeys laws, and avoids victimization); and practical adaptive skills (*i.e.*, personal activities of daily living such as eating, dressing, mobility and toileting; instrumental daily activities of daily living such as preparing meals, taking medication, using the telephone, managing money, using transportation, and doing housekeeping activities; maintaining a safe environment, and occupational skills). *Logan*, 2008 WL 4279820 at *8 n.4 (citing *Manual of Diagnosis and Professional Practice in Mental Retardation* (American Association on Mental Retardation, 1993)).

Here, the ALJ failed to set forth *any* standard for measuring Plaintiff's deficits in adaptive functioning – let alone one of the standards endorsed by the leading mental health organizations.[8] His failure to do so has deprived the Court of the ability to determine the basis for his decision that Plaintiff's "numerous" activities of daily living, sporadic work history, and low grade point average demonstrate the complete nonexistence of "deficits in adaptive functioning." *See Thomas*, 2014 WL 584048, at *9 – 10; *Landsdowne*, 2012 WL 4069363, at *5. Additionally, while the ALJ was unable to obtain evidence of special educational services utilized by Plaintiff, this is not the end of the inquiry into satisfaction of prong three under 12.05(C). *See Gist,* 67 F. App'x at 82 (Claimant failed to meet her burden, because she "presented no evidence to substantiate her testimony that she was placed in special education classes *or otherwise suffered from deficits in adaptive functioning*.") (emphasis added). In distinguishing the case before it from that of an earlier Third Circuit case, the court in *Markle* found it important that there was no evidence that the claimant's mental retardation was of recent origin, or was anything other than a constant from the claimant's childhood through the time of claimed disability. *Markle*, 324 F. 3d at 188 – 89.

Accordingly, upon remand of this case to the Commissioner, the ALJ must thoroughly discuss the third prong under 12.05(C) by: (1) specifically defining "deficits in adaptive functioning," either with reference to one of the standards endorsed by the leading mental health organizations such as the American Psychiatric Association ("APA") or American Association

---

[8]     Because the ALJ here failed to set forth any standard for measuring Plaintiff's deficits in adaptive functioning, this case is unlike the recently decided case of *Harper v. Colvin*, No. 2:13-cv-00446 (ECF No. 15) (W.D. Pa. March 27, 2014) (McVerry, J.). In *Harper*, this Court held that there was no cause for remand even though the ALJ failed to identify and apply one of the recognized standards for measuring deficits of adaptive functioning since he clearly set forth a standard which, while not identical to any of the organizations' standards, nonetheless "embraced the same concepts and appropriately honed in on the ultimate question: whether Plaintiff displayed an 'inability to cope with the challenges of ordinary everyday life.'" *Id.* at 16 (quoting *Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007)). Here, by contrast, the ALJ failed to explain what he was taking into consideration when he determined that Plaintiff lacked the necessary deficits in adaptive functioning, leaving the Court to guess whether that standard was proper.

on Intellectual and Developmental Disabilities ("AAIDD") or a definition which is consistent with the definitions employed by those organizations; (2) addressing why Plaintiff had absolutely no "deficits in adaptive functioning" for purposes of 12.05(C), particularly in light of his functional limitations findings which appeared later in his opinion; and (3) explaining why these deficits did not exist prior to Plaintiff becoming 22 years of age.

### B. RFC Assessment and Hypothetical Question

Plaintiff next contends that the ALJ's RFC assessment and, in turn, the hypothetical question he posed to the vocational expert were incomplete because Plaintiff's intellectual functioning and migraine headaches were not fully accommodated. (ECF No. 11 at 13 – 16). As to Plaintiff's migraine headache pain, the Court finds no reason for remand. Plaintiff cites only her subjective testimony regarding limitations attributable to her migraine headaches, and no objective evidence from treating physicians that Plaintiff's headaches created limitations in her ability to function. No consultative examiners made any such findings.

The ALJ is required to assess the intensity and persistence of a claimant's pain, and determine the extent to which it impairs a claimant's ability to work. *Hartranft v. Apfel*, 181 F. 3d 358, 362 (3d Cir. 1999). This includes determining the accuracy of a claimant's subjective complaints of pain. *Id.* While pain itself may be disabling, and subjective complaints of pain may support a disability determination, allegations of pain must be consistent with the objective medical evidence on record or else they will not be entitled to significant weight. *Ferguson v. Schweiker*, 765 F. 2d 31, 37 (3d Cir. 1985); *Burnett v. Comm'r of Soc. Sec.*, 220 F. 3d 112, 122 (3d Cir. 2000). The Court does not, therefore, find error in the ALJ's decision to not include additional limitations attributable to migraine headaches.

As to Plaintiff's concentration, persistence, and pace, the ALJ explicitly found her to

have moderate limitation. (R. at 18). Hypothetical questions and RFC assessments "must accurately convey . . . all of a claimant's credibly established limitations." *Young v. Comm'r of Soc. Sec.*, 322 F. App'x 189, 191 (3d Cir. 2009) (quoting *Rutherford v. Barnhart*, 399 F. 3d 546, 554 (3d Cir. 2005)). According to the definition supplied by Plaintiff in her brief, moderate limitation implies that a claimant is "occasionally unable to complete simple tasks." (Docket No. 11 at 14) (citations omitted). Plaintiff then cites to *Ramirez v. Barnhart*, 372 F. 3d 546, 554 (3d Cir. 2004), for the proposition that the ALJ's restriction of Plaintiff's work to positions requiring only simple, routine, repetitive tasks was inadequate. However, in *Ramirez*, the court found that the claimant would have deficiencies in concentration, persistence, and pace "often," not occasionally. *Id.* Nonetheless, Plaintiff is correct that the vocational expert did explain that a hypothetical employer would have no tolerance for being off-task during the work day is not unsupported. (ECF No. 11 at 15). Specifically, the vocational expert testified that,

> As far as time on task, all jobs have downtime that can't be accounted for by any one person. If the downtime is accounted for by the worker, it's an hour's [sic] for an hour's work. No one is willing to pay someone to not work.

(R. at 60). The VE also responded in agreement when Plaintiff's counsel stated that "[i]f the machine is broken, then it's on the company. If the [Plaintiff's] not working, that's on the employee." (R. at 60 – 61). Upon remand, the ALJ must address why additional accommodation for Plaintiff's moderate limitation with respect to concentration, persistence, and pace was not provided, or provide such an accommodation in a new RFC assessment and hypothetical question to a vocational expert.

## VI.   CONCLUSION

Based upon the foregoing, the Court concludes that substantial evidence did not support the ALJ's determination at Step 3 with respect to Plaintiff's qualification for benefits under

Listing 12.05(C), or with respect to Plaintiff's moderate limitation in concentration, persistence, and pace. "On remand, the ALJ shall fully develop the record and explain [his or her] findings . . . to ensure that the parties have an opportunity to be heard on the remanded issues and prevent *post hoc* rationalization" by the ALJ. *Thomas v. Comm'r of Soc. Sec.*, 625 F. 3d 798, 800 – 01 (3d Cir. 2010). *See also Ambrosini v. Astrue*, 727 F. Supp. 2d 414, 432 (W.D. Pa. 2010). Testimony need not be taken, but the parties should be permitted input via submissions to the ALJ. *Id.* at 801 n.2.

Accordingly, Plaintiff's Motion for Summary Judgment will be GRANTED, to the extent that remand for reconsideration is sought, and DENIED, to the extent that reversal and an immediate award of benefits is sought; Defendant's Motion for Summary Judgment will be DENIED; and the decision of the ALJ will be VACATED and the case REMANDED to the Commissioner for further proceedings to be consistent with this Court's Opinion. An appropriate order follows.


McVerry, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


JILL M. DEMACIO,             )
                              )
          Plaintiff,        )
                              )
          v.                  )       02:  12-cv-1313
                              )
COMMISSIONER OF         )
SOCIAL SECURITY,         )
                              )
          Defendant.     )


## ORDER OF COURT

**AND NOW**, this 27th day of March, 2014, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED, ADJUDGED, AND DECREED** that:

1.      Plaintiff's Motion for Summary Judgment (ECF No. 10) is **GRANTED**, in part,

insofar as it requests a remand to be consistent with the accompanying

Memorandum Opinion, and **DENIED**, in part.

2.      Defendant's Motion for Summary Judgment (ECF No. 14) is **DENIED**.

3.      The Clerk will docket this case closed.


                                    BY THE COURT:

                                    s/ Terrance F. McVerry
                                    United States District Judge


cc:    **Karl R. Osterhout, Esq.**
       Email: karl@keolaw.com

       **Albert Schollaert**
       Assistant U.S. Attorney
       Email: albert.schollaert@usdoj.gov